# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI WESTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Criminal Action Number** |
| | ) | **07-00367-01-CR-W-HFS** |
| Tam Tran and Tuyetmai Thi Luu, | ) | |
| | ) | |
| Defendant. | ) | |

## Report and Recommendation

Pending before the Court is the MOTION TO SUPPRESS filed jointly on March 25, 2009 (Doc. #53) by defendants Tam Ba Tran ("Tran") and Tuyetmai Thi Luu ("Luu"). On April 28, 2009, and May 14, 2009,, the undersigned held an evidentiary hearing on the defendants' motion. Tran was present and was represented by his attorney, Patrick Peters. Luu was also present and represented by her attorney, Robert Martin. The government was represented by Assistant United States Attorney Rudolph Rhodes. At the evidentiary hearing, the government called two witnesses, Sgt. James Wingo with the Missouri State Highway Patrol, and Detective Roger Bunney with the Independence (Mo.) Police Department. Tran testified on his own behalf. Additionally, the following exhibits were admitted into evidence:

| Number | Description |
|---|---|
| Govt. #1 | Notification and waiver of rights |
| Govt. #2 | Consent to search form (16855 E. 40 Highway) |
| Govt. #3 | Consent to search form (17302 E. 48th Street) |
| Govt. #4 | Evidence log |
| Govt. #5 | Wingo affidavit for search warrant |
| Govt. #6 | Federal search warrant (17302 E. 48th Street) |
| Govt. #7 | Federal search warrant (storage lockers) |
| Govt. #8 | Gift certification |

On the basis of all the evidence adduced at the evidentiary hearing, the undersigned

submits the following:

## PROPOSED FINDINGS OF FACT[1]

1.      Sgt. James Wingo, a 26-year veteran of the Missouri State Highway Patrol, was assigned as narcotics investigator with the Highway Patrol's Division of Drug and Crime Control in October of 2007.  Tr. at 6.

2.      On October 4, 2007, at approximately 12:55 p.m., Sgt. Wingo was performing surveillance outside the Green Circle Hydroponics store in Overland Park, Kansas.  Tr. at 7.

3.      At that time, Sgt. Wingo observed a blue Plymouth minivan pull up to the store. Tr. at 7.

4.      Sgt. Wingo observed the driver (later identified as Tran) enter the store and exit a short time later carrying a box along with a store employee who loaded four rolls of mylar in the minivan.  Tr. at 8.

5.      Sgt. Wingo then followed the minivan to a residence at 14310 E. 39th Street in Independence, Missouri.  Tr. at 8.

6.      On October 16, 2007, at approximately 1:25 p.m., Sgt. Wingo was agin performing surveillance at the Green Circle Hydroponics store in Overland Park, Kansas.  Tr. at 9.

7.      At that time, Sgt. Wingo again observed Tran and the blue minivan arrive at the store and leave a few minutes later after Tran had purchased some items, including a high intensity discharge light bulb box.  Tr. at 9.

8.      Sgt. Wingo again followed Tran.  Tr. at 10.

---

[1]      In making these proposed factual findings, the Court is called upon to resolve conflicting testimony between Tran, on one hand, and the two officers, on the other, and, in so doing, the Court has to make credibility determinations.  In making such determinations, the Court concludes that the testimony of Tran is not credible on those matters where there is a direct conflict with the officers' testimony.  The Court reaches this conclusion based upon  (1) the demeanor of the witnesses on the stand; (2) the interest the witnesses have in the outcome of the motion; (3) the opportunity of the witnesses to hear, observe, and recall what was said or done; and (4) any conflicts (factual and logical) within the witnesses' testimony. These proposed factual findings will include only the evidence and testimony that the Court found to be credible and relevant to the MOTION TO SUPPRESS before the Court.

2

9.      Tran then proceeded in the blue minivan to a turf wholesale business where an employee loaded Pro-Mix potting soil bags into the minivan using a forklift.  Tr. at 10.

10.      Sgt. Wingo then followed Tran to a storage locker facility at 16855 East Highway 40 in Independence, Missouri.  Tr. at 10.

11.      After some time, Tran left the storage facility and proceeded to a residence at 17302 48th Street Court in Independence, Missouri.  Tr. at 11.

12.      Tran was inside that residence for 15-20 minutes.  Tr. at 11.

13.      By this time, Sgt. Wingo had contacted the Independence (Mo.) Police Department which sent other officers to assist in the surveillance of Tran.  Tr. at 11-12.

14.      Among the officers sent by Independence (Mo.) Police Department was Detective Roger Bunney, an 18-year veteran of the department who was assigned to the Drug Enforcement Unit.  Tr. at 66-67

15.      The surveilling officers then followed Tran when he left the 48th Street Court address, while Sgt. Wingo drove on ahead to the residence at 14310 E. 39th Street in Independence, Missouri, where Tran had been observed a few weeks earlier.  Tr. at 11-12.

16.      Upon arriving at 14310 E. 39th Street and parking in a nearby church parking lot, Sgt. Wingo noted that nobody appeared to be at the residence.  Tr. at 12, 30.

17.      After a period of time, Tran arrived at 14310 E. 39th Street.  Tr. at 12.

18.      While Tran was in the process of backing the minivan into the garage, Sgt. Wingo exited his vehicle and approached Tran.  Tr. at 12.

19.      Tran stopped the minivan and got out to talk with Sgt. Wingo.  Tr. at 13.

20.      Detectives Bunney and Mike Hozak from the Independence (Mo.) Police Department were also present at this time, having pulled into the driveway as Sgt. Wingo was approaching Tran's minivan.  Tr. at 13, 69, 85-86.

21.      The two detectives were approximately 10-18 feet from Tran while he talked with Sgt. Wingo.  Tr. at 26-27, 70, 72.

22.      Both the detectives and Sgt. Wingo were dressed in plain clothes.  Tr. at 29, 69.

23.      Sgt. Wingo asked Tran if he spoke English and Tran said that he did.  Tr. at 13, 35, 70.

3

24. Sgt Wingo then asked Tran how he was doing and Tran shook Sgt. Wingo's hand and said he was doing okay. Tr. at 36.

25. Sgt. Wingo then identified himself by showing Tran his badge and identification card. Tr. at 14, 35-36.

26. Sgt. Wingo also identified who Detectives Bunney and Hozak were. Tr. at 14.

27. Sgt. Wingo asked Tran if he lived at the house and Tran said that he had been living there about two weeks and was renting from a person named Wilman. Tr. at 14, 70.

28. Sgt. Wingo then told Tran that he believed there was an indoor marijuana growing operation inside the house. Tr. at 14, 36, 45, 70.

29. Sgt. Wingo further told Tran that when he had such information, it was his job to follow up on the information. Tr. at 14, 36, 41-43.

30. Sgt. Wingo then told Tran that "if it was alright with him," the officers would come in and get his marijuana plants. Tr. at 14, 36-37, 44-46, 70.

31. Tran responded by saying "Sure, okay." Tr. at 14, 70.

32. Sgt. Wingo then asked Tran if there were marijuana plants in the house and he said yes. Tr. at 14, 47.

33. At that point, Sgt. Wingo did not believe that Tran was free to leave. Tr. at 28.

34. Sgt. Wingo then asked Tran how many plants were in the house and he responded that he did not know. Tr. at 14, 47.

35. Sgt. Wingo then asked Tran if he would like to show the officers the plants in the house and Tran said "Sure" and started walking toward the garage. Tr. at 14-15, 47.

36. Sgt. Wingo felt that the exchange was pleasant, friendly, and conversational. Tr. at 15, 73.

37. None of the officers had weapons drawn. Tr. at 15, 69-70, 72-73.

38. Sgt. Wingo made no deals, threats, or promises to Tran. Tr. at 15, 72.

39. Tran did not appear to be intoxicated or under the influence of drugs. Tr. at 15, 75.

40. Tran thereafter walked to the garage door keypad and entered the entry code,

4

opening the garage door.  Tr. at 16, 72.

      41.      Tran then led the officers into the living room of the residence.  Tr. at 16.

      42.      After looking around the ground floor of the ranch-style house, Sgt. Wingo asked Tran how to get access to the basement.  Tr. at 16.

      43.      Tran then led the officers back out to the garage and pointed to a door that led to the basement.  Tr. at 16.

      44.      Believing the basement door to be locked, Sgt. Wingo asked Tran for the key.  Tr. at 17.

      45.      Tran handed Sgt. Wingo his set of keys and pointed out the key for the basement door.  Tr. at 17.

      46.      Sgt. Wingo inserted the key, but discovered that the door was not locked.  Tr. at 17.

      47.      Sgt. Wingo then walked down to the basement and could smell marijuana in the stairwell.  Tr. at 17, 48, 72.

      48.      In the basement, Sgt. Wingo discovered a marijuana growing operation.  Tr. at 17, 48, 72-73.

      49.      At that point, Tran was advised of his rights and Sgt. Wingo asked Tran if he was willing to speak with the officers.  Tr. at 17.

      50.      Tran then was asked to read and sign a notification and waiver of rights form.  Tr. at 18; Govt. #1.

      51.      Tran read along as Sgt. Wingo read his rights to him.  Tr. at 19.

      52.      Sgt. Wingo then asked Tran if he understood his rights.  Tr. at 19.

      53.      Tran was then asked to, and did, sign the first part of the notification and waiver of rights form.  Tr. at 19; Govt. #1.

      54.      Tran then read along as Sgt. Wingo read the waiver of rights provision on the form.  Tr. at 19.

      55.      Sgt. Wingo then asked Tran if he was still willing to speak with officers.  Tr. at 19.

56.     After Tran said that he was willing to speak with the officers, he was asked to, and did, sign the second part of the notification and waiver of rights form.  Tr. at 19; Govt. #1.

57.     In signing the second part of the notification and waiver of rights form, Tran also provided information that he was 43 years old, had attended school through the 12th grade level and indicated "N/A" for an employer.  Govt. #1.

58.     Sgt. Wingo then questioned Tran in English.  Tr. at 19-20.

59.     Following the questioning, Tran was afforded the opportunity to write a brief statement, which he did in English.  Tr. at 19.

60.     Subsequently, Detective Bunney asked Tran for consent to search the storage facility he had been seen at earlier.  Tr. at 20, 74.

61.     Although Tran was then under arrest, the conversation occurred at a dining room table, Tran was handcuffed, and the only officers present were Sgt. Wingo and Detective Bunney.  Tr. at 20.

62.     Tran verbally consented to a search of the storage unit.  Tr. at 20, 74.

63.     Prior to taking Tran to the storage unit, Sgt. Wingo told Tran that officers would continue to search the residence while they were gone, but Tran could at any time tell them to stop searching and, if necessary, Sgt. Wingo would radio back to officers at the residence to stop the search.  Tr. at 21.

64.     Upon arriving at the storage facility, Detective Bunney read out loud to Tran the consent to search form.  Tr. at 74, 76-77, 89.

65.     Detective Bunney then told Tran that if he was consenting to the search, then he should sign the bottom of the form.  Tr. at 74-77, 88-89.

66.     Tran then signed the bottom of the form.  Tr. at 74-77; Govt. #2.

67.     Detective Bunney made no threats toward Tran.  Tr. at 75.

68.     A search of the storage unit then ensued with Tran present.  Tr. at 20-21.

69.     While still at the storage unit, Tran informed Detective Bunney that he sometimes stayed at the residence on 48th Street Court and his personal belongings were there.  Tr. at 78.

70.     Detective Bunney the asked Tran for permission to search the residence on 48th Street Court.  Tr. at 78.

6

71.     Tran refused to consent stating that it was it was his ex-wife's house and "she may give consent."  Tr. at 78.

72.     Detective Bunney then transported Tran to the residence on 48th Street Court.  Tr. at 78.

73.     Detective Bunney, another officer, and Tran then knocked on the door.  Tr. at 78.

74.     The door was answered by Luu.  Tr. at 78.

75.     Detective Bunney identified himself as a police detective and asked if he could inside the house to explain the reason for the police presence.  Tr. at 78-79, 96.

76.     Luu invited them into the living room.  Tr. at 78-79.

77.     Detective Bunney then asked Luu if she spoke English and she said "yes, but not very well.  Tr. at 78-79.

78.     Luu indicated that her son Phong, a teenager who was also in the living room, spoke English fluently.  Tr. at 79.

79.     Detective Bunney then asked Phong to translate to his mother.  Tr. at 79, 97.

80.     Through Phong, Detective Bunney told Luu that he was conducting a drug investigation, the investigation involved Tran, and the officers were asking for her permission to search the residence.  Tr. at 79-80.

81.     Phong then spoke to Luu in Vietnamese.  Tr. at 79.

82.     Thereafter, Luu turned to Detective Bunney and said "yes, you can look around." Tr. at 79-80, 83.

83.     Detective Bunney then prepared a consent to search form.  Tr. at 79-80.

84.     Detective Bunney then asked Phong to read the form word-for-word to Luu and ask her to sign at the bottom if she was consenting to a search.  Tr. at 79-81, 97.

85.     After Phong translated the form, Luu signed the form at the bottom.  Tr. at 81-82, 92, 96; Govt. #3.

86.     The ensuing five minute search was conducted merely to look for marijuana and items for cultivating marijuana.  Tr. at 82.

87.     The search did not uncover any contraband.  Tr. at 82.

7

88.    Detective Bunney made no threats toward Luu.  Tr. at 80.

89.    Luu appeared to understand what was being communicated to her.  Tr. at 83.

90.    Based on the evidence obtained in the searches of the residence on 39th Street and the storage facility, Sgt. Wingo then prepared an affidavit in support of a search warrant for a residence at 132 SW Moore in Blue Springs, Missouri (an address mentioned in documents located in the prior searches).  Tr. at 22-23.

91.    The ensuing search of that house produced incriminating evidence.  Tr. at 23-24, Govt. #5.

92.    Two days later, on October 18, 2007, Sgt. Wingo prepared another affidavit to obtain search warrants to search (again[2]) the storage facility as well as the house at 48th Street Court.  Tr. at 24-25; Govt. #6; Govt. #7.

93.    Sgt. Wingo and Detective Bunney always spoke with Tran in English and Tran always responded in English.  Tr. at 26, 83-84.

94.    Tran always appeared to understand what he was being asked.  Tr. at 26, 83-84.

95.    Sgt. Wingo felt that Tran was fluent in English, although he spoke with an accent. Tr. at 36.

96.    Tran told Detective Bunney that he could read and write in English.  Tr. at 83.

97.    At the hearing before the Court, Tran testified in English without an interpreter until near the end of his testimony when a Vietnamese interpreter was utilized (although Tran continued to answer many questions in English).  Tr. at 98-123, 4A-29A.[3]

98.    Tran has been in the United States since 1998.  Tr. at 112.

99.    Tran has been a naturalized citizen since 2004.  Tr. at 112.

100.    In becoming a naturalized citizen, Tran passed an English proficiency test.  Tr. at

---

[2]    During the prior search, officers had not seized documents in the storage facility. Sgt. Wingo was concerned that prior consent might not still be valid after the passage of a couple of days.  Tr. at 25.

[3]    The original hearing in this matter occurred on April 28, 2009, but had to be continued with the examination of Tran uncompleted.  The hearing was concluded on May 14, 2009.  Transcript page designations ending with an "A" refer to the May 14 hearing date.

8

113.

## PROPOSED CONCLUSIONS OF LAW

In their MOTION TO SUPPRESS, the defendants seek to suppress evidence obtained by law

enforcement officers on the basis that "consent to search was not voluntarily given."[4]  In so

arguing, the defendants do not dispute that consent to a search is a valid exception to the warrant

requirement of the Fourth Amendment.  Accordingly, the Court will focus on the voluntariness

of Trans' consent.

It is well established that "[t]he question whether a consent to search was in fact

voluntary or was a product of duress or coercion, express or implied, is a question of fact to be

determined from the totality of all the circumstances."  *Schneckloth v. Bustamonte*, 412 U.S. 218,

227 (1973).  In that regard, "[t]he totality of the circumstances includes the characteristics of the

person giving consent and the encounter from which the consent arose."  *United States v.*

*Sanchez*, 156 F.3d 875, 878 (8th Cir. 1998).

> Relevant characteristics of the consenting party include age,
> intelligence and education: chemical intoxication (if any); whether
> the individual was informed of the right to withhold consent; and
> whether the suspect generally understood the rights enjoyed by
> those under criminal investigation . . . .To assess the environment
> surrounding the consent, we consider the length of time that the
> suspect was detained and questioned, whether the police
> intimidated the suspect; whether the suspect relied upon promises

---

[4]        The defendants argue that, in addition to the two consent searches involving Tran,
Luu did not voluntarily consent to a search of her residence on 48th Street Court.  However, the
defendants concede that no contraband was seized (that might be suppressed )from that search.
At the evidentiary hearing, the defendants argued that the facts surrounding the search of the Luu
residence either (1) established a pattern of law enforcement behavior that was relevant to the
consensual searches involving Tran, or (2) established a Vietnamese mind set that suggested that
Tran's consent in his searches was not voluntary.  Under the facts and evidence presented, the
Court finds neither argument availing.

or misrepresentations made by the police; whether the suspect was in custody when the consent was given; whether the encounter occurred in a public or secluded place; and whether or not the suspect objected to the search.

*Id.* In this case, after carefully considering the evidence, the Court concludes that Tran's consent to both the search of the residence on 39th Street and the storage facility on Highway 40 were voluntary. In reaching the conclusion of voluntariness, the Court is mindful that Tran is not a native English speaker and spent a portion of his life outside the United States in countries where criminal suspects do not enjoy the same rights and protections as are recognized in this country. Nonetheless, there is overwhelming evidence in this case that Tran made a knowing and voluntary consent to search.

Tran is an intelligent and articulate gentleman who was over 44 years old at the time of the consent, had previously been a business owner-operator in this country for several years, had been a naturalized citizen for approximately four years, and was not impaired or intoxicated at the time of the consent. While English is not Tran's native language he testified in Court primarily in English demonstrating adequate comprehension of the questions and the legal process. In addition, as part of his naturalization, Tran passed English proficiency. Finally, based on the credible testimony of the officers, the Court concludes that Tran was aware of the purpose for the officers' requests for the consent, the import of consenting, and his option of not consenting (demonstrated, in part, by his later refusal to consent to a search of Luu's residence). In short, the Court finds that Tran generally understood the rights enjoyed by those under criminal investigation.

The Court has also considered the defendants' argument that the environment surrounding the consent was so imposing and intimidating so as to render Tran's consent as involuntary and under duress. While Tran was certainly outnumbered by law enforcement

10

officers at the times he gave his consent, such a fact does not establish a lack of voluntariness. This is particularly true where, as here, "no evidence suggest[s] the officers physically intimidated, threatened, or coerced [Tran] in any manner." *United States v. Comstock*, 531 F.3d 667, 677 (8th Cir. 2008). Viewing the totality of the circumstances, the Court finds that Tran's consents to search were voluntary.

Accordingly, it is

**RECOMMENDED** that the Court, after making an independent review of the record and applicable law, enter an order **DENYING** Tran and Luu's MOTION TO SUPPRESS filed on March 25, 2009 (Doc. #53).

Counsel are reminded that each has 10 days from the date of receipt of a copy of this report and recommendation to file and serve specific objections to the same. A failure to file and serve timely objections shall bar attack on appeal of the factual findings in this report which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

*/s/ John T. Maughmer*

**John T. Maughmer**
**United States Magistrate Judge**

11